UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | C.A. No. 3:25-cv-30042 |
| REPUBLIC FRANKLIN INSURANCE COMPANY, | ) |  |
|  | ) |  |
| *Plaintiff,* | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| MISS HALL'S SCHOOL, INC. and | ) |  |
| JEANNIE NORRIS, | ) |  |
|  | ) |  |
| *Defendants.* | ) |  |
| _____ | ) |  |

## AMENDED COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Republic Franklin Insurance Company ("Republic Franklin") asserts this complaint for declaratory judgment against Miss Hall's School, Inc. ("MHS") and Jeannie Norris, as follows.

### PRELIMINARY STATEMENT

1.     Republic Franklin seeks a declaration that it does not owe a duty to indemnify MHS or Ms. Norris with respect to the claims in the lawsuit <u>Melissa Fares v. Miss Halls School, Inc., et al.</u>, Berkshire County Superior Court, Civil Action Number 2475CV00161 ("Fares Litigation").

### PARTIES

2.     Republic Franklin is a New York corporation with a principal place of business in New Hartford, New York. Republic Franklin is an insurer.

3.     Miss Hall's School, Inc. is a Massachusetts corporation formed under Massachusetts General Laws Chapter 180. MHS is a private boarding and day secondary school located in Pittsfield, Massachusetts.

4.     Jeannie Norris is an individual residing in North Carolina. Ms. Norris is the former Head of MHS.

<u>JURISDICTION AND VENUE</u>

5.     The Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332(a)(1) by virtue of diversity of citizenship. The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Republic Franklin brings this action for declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

7.     Venue is proper pursuant to 28 U.S.C. § 1391(a)-(c). MHS is a resident of this district, the events and omissions giving rise to this controversy occurred in this district, and MHS transacts business and is subject to personal jurisdiction in this district.

<u>FACTS</u>

8.     On October 15, 2024, a former MHS student named Melissa Fares initiated the Fares Litigation against MHS and Ms. Norris. On January 9, 2025, Ms. Fares filed an amended complaint in the Fares Litigation. A copy of the operative Amended Complaint is attached at Tab 1.

9.     Ms. Fares alleges that when she was a boarding student at MHS from 2007 to 2010, she was sexually abused and raped by MHS teacher Matthew Rutledge.

Ms. Fares alleges that Rutledge began sexually abusing her during the 2007-2008 school year when she was a fifteen-year-old high school sophomore and Rutledge was forty-five years old.

10.    Ms. Fares further alleges that before she was sexually abused and raped by Rutledge, Rutledge had sexually abused and engaged in sexual misconduct towards other MHS students.

11.    Ms. Fares further alleges that MHS administrators, including Ms. Norris, knew of Rutledge's prior misconduct towards the other students, but took no action to protect its students.

12.    Ms. Fares makes detailed allegations in her amended complaint concerning MHS's and Ms. Norris's prior knowledge that Rutledge "was a sexual predator who had groomed, harassed, and/or abused students for over a decade" prior to Rutledge sexually abusing and raping Ms. Fares. Ms. Fares identifies specific students she alleges were sexually abused by Rutledge, and identifies specific instances in which MHS administrators, including Ms. Norris, were made aware of Rutledge's egregious behavior. Ms. Fares further alleges that MHS and Ms. Norris failed to report Rutledge's abuse of MHS students to law enforcement or Massachusetts Child Protection as required by law.

13.    Ms. Fares and at least one other MHS student also have made detailed allegations in the media concerning MHS's and Ms. Norris's knowledge that Rutledge had sexually abused MHS students and failed to report such incidents to the proper

authorities as required by law. On January 16, 2025, Vanity Fair published an in-depth article concerning the allegations, a copy of which is attached at Tab 2.

14.    Republic Franklin issued to MHS policies of insurance that include comprehensive general liability ("CGL") coverage. Among the policies issued by Republic Franklin to MHS was a policy numbered CPP 3964893 with effective dates of July 1, 2007 to July 1, 2008 ("2007-2008 Policy").

15.    Republic Franklin is unable to locate a complete copy of the CGL portion of the 2007-2008 Policy, which issued more than seventeen years ago. Republic Franklin has, however, located the Declaration Page for the CGL portion of the 2007-2008 Policy, which lists the policy forms. Republic Franklin has compiled the potentially relevant listed forms from various sources, which are as attached at Tab 3.

16.    Republic Franklin is providing a defense of the Fares Litigation to MHS and Ms. Norris pursuant to a reservation of rights. The defense is being provided pursuant to the 2007-2008 Policy – *i.e.*, the policy of insurance that was in place when Rutledge first allegedly began sexually abusing Ms. Fares.

17.    The 2007-2008 Policy includes a form titled: "Abuse or Molestation Liability Coverage Form (Including Sexual Misconduct or Sexual Molestation)" ("Abuse Form"). The Abuse Form provides that "[e]xcept for the insurance provided by this Coverage Part, the policy to which this Coverage Part is attached does not apply to any claim or 'suit' seeking damages arising out of any actual or alleged act of abuse or molestation (including sexual misconduct or sexual molestation)."

18.    The Abuse Form excludes coverage for any person who knowingly allowed a "wrongful act," or failed to report any "wrongful act" to the proper authorities, as follows:

> **SECTION I – ABUSE OR MOLESTATION LIABILITY COVERAGE (INCLUDING SEXUAL MISCONDUCT OR SEXUAL MOLESTATION)**
> …
> **2.    Exclusions.**
>
> This insurance does not apply:
>
> **a.**    To any person who:
> …
> **(2)**    Knowingly allowed any "wrongful act" or failed to report any "wrongful act" to proper authorities.

19.    The Abuse Form in the 2007-2008 Policy defines "wrongful act" as follows:

> **SECTION V – DEFINITIONS**
> …
> **5.**    "Wrongful act" means:
>
> **a.**    Any act of actual or threatened abuse or molestation (including sexual misconduct or sexual molestation) which results in injury to another; or
>
> **b.**    The negligent:
>
> **(1)**    Employment;
> **(2)**    Investigation;
> **(3)**    Supervision;
> **(4)**    Reporting to the proper authorities, or failure to so report; or
> **(5)**    Retention;

> Of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **a.** above.
>
> For the purpose of this coverage, abuse means an intentional, inherently harmful act.

20.    MHS and Ms. Norris knowingly allowed Rutledge's "wrongful acts" towards MHS students. As such, the 2007-2008 Policy excludes coverage for Ms. Fares's claims.

21.    MHS and Ms. Norris failed to report Rutledge's "wrongful acts" to the proper authorities. As such, the 2007-2008 Policy excludes coverage for Ms. Fares's claims.

22.    The Abuse Form in the 2007-2008 Policy also excludes coverage if MHS failed to give Republic Franklin written notice within 60 days of being notified of an incident that appears likely to result in a claim involving a "wrongful act," as follows:

> **SECTION I – ABUSE OR MOLESTATION LIABILITY COVERAGE (INCLUDING SEXUAL MISCONDUCT OR SEXUAL MOLESTATION)**
> …
>
> **2.    Exclusions.**
>
> This insurance does not apply:
>
> …
> **c.**    If you fail to give us written notice within 60 days of your being notified of an incident which appears likely to result in a claim or "suit" involving a "wrongful act."

23.    MHS failed to give Republic Franklin written notice within 60 days of its being notified of an incident that appeared likely to result in a claim or suit

involving Rutledge's "wrongful acts" towards MHS students. As such, the 2007-2008 Policy excludes coverage for Ms. Fares's claims.

24.    No other provision of 2007-2008 Policy, or any other policy of insurance issued by Republic Franklin to MHS, provides coverage for Ms. Fares's claims.

<u>COUNT ONE – DECLARATORY JUDGMENT</u>

25.    Republic Franklin repeats and incorporates by reference paragraphs one through twenty-four of this complaint.

26.    The 2007-2008 Policy excludes coverage for the claims set forth in the Fares Litigation.

27.    No other policy issued by Republic Franklin to MHS provides coverage for the claims set forth in the Fares Litigation.

28.    Pursuant to the terms and conditions of the 2007-2008 Policy, and any other policy issued by Republic Franklin to MHS, Republic Franklin does not owe a duty to indemnify MHS or Ms. Norris for the claims set forth in the Fares Litigation.

29.    An actual case and controversy exists between Republic Franklin, MHS, and Ms. Norris as to whether Republic Franklin must indemnify MHS and Ms. Norris for the claims set forth in the Fares Litigation.

WHEREFORE, pursuant to 28 U.S.C. §§ 2201-2202 and Rule 57 of the Federal Rules of Civil Procedure, Republic Franklin respectfully requests that the Court issue a Declaratory Judgment against MHS and Ms. Norris, providing that Republic Franklin owes no duty to indemnify MHS or Ms. Norris from the claims set forth in

the Fares Litigation, or to enter such other relief as the Court deems just and appropriate.

REPUBLIC FRANKLIN INSURANCE
COMPANY

By its Attorneys,

Dated: May 6, 2025

_____
Kurt B. Fliegauf (BBO # 564329)
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
One Federal Street, 15th Floor
Boston, MA 02110
Phone: (617) 482-8200
kfliegauf@connkavanaugh.com

4938-4506-6559, v. 1

Tab 1

COMMONWEALTH OF MASSACHUSETTS

BERKSHIRE, SS                                    SUPERIOR COURT
                                                C.A. NO. 2476CV00161

_____
                              )
MELISSA FARES                 )
        Plaintiff             )
                              )
v.                            )
                              )
MISS HALLS SCHOOL, INC,       )
JEANNIE NORRIS,               )
MATTHEW RUTLEDGE, JANE        )
DOE 1, JANE DOE 2 AND JANE    )
DOE 3,                        )
        Defendants.           )
_____ )


**AMENDED COMPLAINT AND JURY DEMAND**

Melissa Fares, a boarding school student at Miss Hall's School, Inc. from 2007 to 2010,

was sexually abused and raped by her Miss Hall's teacher and advisor, Matthew Rutledge. Prior

to sexually abusing Melissa, Rutledge had groomed, violated boundaries, sexually harassed,

sexually abused and engaged in other sexual misconduct toward other Miss Hall's students, and

Miss Hall's administrators including then Head of School Jeannie Norris and Does 1 through 3

knew or should have known about his prior misconduct. Despite this knowledge, Rutledge was

not properly supervised and students – including Melissa – were not protected from him.

Rutledge remained employed by Miss Hall's until Melissa came forward in or around March

2024 and publicly revealed Rutledge's abuse.

Melissa brings this action seeking monetary damages against: Miss Hall's for strict

liability under GL c 151C; Norris and Does 1 through 3 under three separate claims of

negligence; and Rutledge for assault and battery.

I.     **PARTIES**

1.     Plaintiff Melissa Fares ("Melissa") is a natural person who resides in the State of Connecticut.

2.     Defendant Miss Hall's School, Inc. ("Miss Hall's" or "the School") is a Massachusetts corporation formed under the provisions of GL c 180. Miss Hall's is located at 492 Holmes Road, Pittsfield, Massachusetts.

3.     Defendant Matthew Rutledge ("Rutledge") is a natural person who resides at 285 Old Stockbridge Road, Lenox, Massachusetts.

4.     Defendant Jeannie Norris ("Norris") is a natural person who resides at 220 South Bend Drive, Durham, North Carolina.

5.     Defendants Jane Doe 1, Jane Doe 2 and Jane Doe 3 ("Does 1-3") are all current or former administrative and/or supervisory employees of Miss Hall's who knew or should have known that Rutledge had a propensity to sexually abuse children at Miss Hall's prior to or during the time that Rutledge sexually raped and abused Melissa yet failed to take action to protect Melissa from Rutledge's predatory and abusive misconduct.

II.    **JURISDICTION AND VENUE**

6.     Jurisdiction is conferred upon this Court pursuant to GL 223A §3 as the acts took place in Massachusetts.

7.     Venue is proper as Miss Hall's is located, and Rutledge resides in Berkshire County, Massachusetts.

III.   **FACTS**

8.     Melissa was born on April 28, 1992.

9.      Melissa applied to Miss Hall's and enrolled for the fall semester of 2007 when she was a 15-year-old sophomore. She graduated from Miss Hall's in June 2010 when she was 18 years old.

10.      Defendant Norris was the Head of School during Melissa's enrollment.

11.      Shortly after she enrolled, Melissa met Rutledge, a popular history teacher at Miss Hall's. Rutledge had been employed at the School since 1991 in various capacities, including teacher, dorm parent, advisor and coach.

12.      During all relevant times, Norris and Does 1-3 failed to adequately train its faculty/staff and administrators to recognize and respond to grooming, boundary violations, sexual harassment, sexual abuse and other sexual misconduct by adults toward students. Norris and Does 1-3 failed to adequately train its faculty/staff and administrators to report any such misconduct within Miss Hall's hierarchy and in accordance with child abuse reporting laws, and investigate any such misconduct.

13.      During all relevant times, Norris and Does 1-3 failed to adequately train its students to recognize and respond to grooming, boundary violations, sexual harassment, sexual abuse and other sexual misconduct by adults toward children, and report any such misconduct.

14.      During all relevant times, Norris and Does 1-3 failed to educate faculty/staff and students about the consequences of grooming, boundary violations, sexual harassment, sexual abuse and other sexual misconduct.

**A.      Sophomore Year**

15.      Rutledge started paying special attention to Melissa during her first year at Miss Hall's and groomed her for a sexual relationship. Among other things, he told Melissa that she was "his type" and asked her personal questions, such as whether she had ever had oral sex. He

complimented her on her outfits and personal appearance. He gave her nicknames including "Little One," "Special One," "Little Girl," "Little Melissa," "Piglet," "Protector," and "Protectee."

16.    Rutledge also encouraged Melissa to come to his classroom alone, after class and oftentimes during study hall at night, making excuses to be alone with her, including that he could help her become a better writer.

17.    Rutledge sexually abused Melissa during this time frame. He would graze her breasts and give her long, lingering hugs, pressing his (sometimes erect) genitals against her. He would sit next to her on trips in the school van and press his leg tightly against her leg.

18.    During her sophomore year, Rutledge gave Melissa gifts, including mixtapes with sexually provocative songs, children's books, stuffed animals, and jewelry.

19.    Rutledge, then 45-years old, professed his love for 15-year-old Melissa, and devised a code to communicate his feelings for her.

20.    In February 2008 (the spring of Melissa's sophomore year), parents of a former Miss Hall's student ("Student C") wrote to Norris to alert her to Rutledge's "unmistakably inappropriate" behavior toward their daughter. They urged Norris "to take the necessary steps to protect other young women…from this experience." Norris and Miss Hall's kept a copy of this letter in Student C's file.

21.    After receiving this letter from Student C's parents, Norris met with the parents. During their meeting, Norris took notes, asked the parents if they planned to sue the School, and assured them that she would handle Rutledge's misconduct.

22.    Norris and Does 1-3 (to the extent one or more of them knew about the letter from Student C's parents and/or Norris's meeting with them) did nothing to protect Melissa from

4

Rutledge in the aftermath and he continued to groom, violate boundaries, sexually harass and sexually abuse her.

23.     Toward the end of Melissa's sophomore year – in or around late Spring 2008 – she considered not returning to Miss Hall's for her junior year. In a meeting with Norris, Melissa's mother was asked if there was anyone on campus that Melissa trusted. Her mother replied, "Mr. Rutledge." A red flag should have gone up for Norris immediately.

24.     Instead, despite knowing that Rutledge's misconduct with a former student was so "unmistakably inappropriate" that Norris feared a lawsuit against the School, Norris decided that Rutledge was an appropriate person to persuade Melissa to stay at Miss Hall's.

25.     Rutledge wrote an overly familiar personal note in Melissa's sophomore yearbook expressing "hope" that she would stay at Miss Hall's:

> *Little Melissa....What a pleasure it's been teaching you and getting to know you! I've enjoyed the many things we've done together, including peeling oranges, resume writing, 'seeing how the waist was won,' and laughing a lot. I admire your family very much, and I appreciate your kindness. You're a lucky girl to have people love you as they do, and I'm sure we will see each other again...Your friends and fans here hope you will come back here, and none more than I. You're not done growing at MHS yet. Thank you, thank you, for being SO NICE! Fondly, M.R.*

26.     Then, that summer, Rutledge traveled to Melissa's home in Connecticut and stayed at her family's guest house (which he dubbed "The Rutledge Cottage") for the weekend. He took long walks with Melissa, held her hand, and groped her. He told her to lean on his shoulder as he read to her children's books, such as Winnie the Pooh. He massaged her upper thigh under the table. He left behind his Burberry cologne in the cottage in case Melissa missed his scent, he told her.

27.     Rutledge succeeded in what Norris had charged him to do: he convinced Melissa to return to Miss Hall's the following year.

**B.    Junior Year**

28.    When Melissa returned for her junior year (Fall 2008-Spring 2009), Norris and/or Does 1-3 assigned her to Rutledge's American Politics and Government class.

29.    Rutledge also had the idea to become Melissa's advisor, replacing her assigned advisor, Gary Miller.

30.    At Miss Hall's, advisors were quasi-parents to their advisees. Advisors were supposed to foster a close relationship with their advisees so that advisees could feel comfortable going to their advisors as a resource not only for academic, but also more personal issues. Advisors collected information from other teachers and coaches and used that information to serve as a liaison with parents. Advisors could also grant privileges to advisees, including allowing an advisee to go off campus.

31.    Norris and/or Does 1-3 allowed Miller to be removed as Melissa's advisor and replaced Miller with Rutledge.

32.    During Melissa's junior year, Rutledge continued to tell Melissa to come to his classroom alone at night under the pretext of reviewing her schoolwork.

33.    Rutledge continued to groom, sexually abuse, and have sexually inappropriate conversations with Melissa that year.

34.    That year, Rutledge also gave Melissa a variety of gifts, including a Claddagh ring. He told her to wear it on her finger, with the heart facing her, symbolizing she was "taken."

35.    Rutledge would often use his fingers to apply Carmex lip balm directly to Melissa's lips, as if she was incapable of doing it herself.

36.    Rutledge took Melissa off-campus to Great Barrington, MA and kissed her for the first time.

37.     Then, one day in 2008, during the fall of her junior year, when Melissa was only 16 years old, Rutledge instructed her to come to his classroom very early the following morning. She arrived wearing pajama pants (per Rutledge's instruction). Rutledge met her at his classroom door, pulled her inside, and closed the door behind her. He then pulled the shade down and locked the door. He instructed Melissa to lie down under the classroom table, and Rutledge removed her pants. He then inserted his tongue into Melissa's vagina, orally raping her.

38.     Melissa was paralyzed, did not react, and did nothing in response. She felt outside of her body and now knows that she was clearly disassociating. She did not verbally consent.

39.     Later in the spring of 2009, after she had just turned seventeen and was still a virgin, Rutledge instructed Melissa to again come to his classroom early. He met Melissa at the door, brought her into the room and again locked the door. Rutledge brought Melissa into a closet where there was a yoga mat laying on the ground. Rutledge guided Melissa down to the mat, undressed her, took off his pants and underwear and raped her. He did not wear a condom, did not ask for consent and she did not give it. Again, Melissa was paralyzed. She started to cry.

40.     At all times, there was a substantial power differential as Rutledge was Melissa's teacher and advisor. She was a teenager and was vulnerable to a grown man who, as her teacher and advisor, could, among other things, determine her grades, grant her freedom to go off-campus or give her other privileges, and write summer internship and college recommendations.

41.     The summer after her junior year, Rutledge returned to visit Melissa's home in Connecticut. One night, he instructed Melissa to come to the guest cottage where he slept. He made her perform oral sex on him and orally raped her. He then raped her and ejaculated inside of her. Melissa dissociated.

### C.      Senior Year

42.      Rutledge's sexual abuse and exploitation of Melissa continued throughout her senior year. He was a master of manipulation and wielded a lot of power over Melissa.

43.      At times during her senior year, Rutledge would invite Melissa to his campus home and serve her alcohol. At all times, she was underage.

44.      That year, Rutledge also used Melissa's friendship with his daughter and encouraged sleepovers at his campus home. During these sleepovers, Rutledge continued to rape Melissa in his guest room and study.

45.      Whenever a Miss Hall's student was not going to be sleeping in their dorm room, they needed to get special permission from the School. Dorm parents, who were responsible for Melissa at night, and other supervisors at Miss Hall's were aware that Melissa was sleeping at Rutledge's campus home. Nobody at Miss Hall's questioned whether this was safe or in Melissa's best interest or prohibited Melissa from sleeping over at Rutledge's home.

46.      Rutledge's sexual abuse of Melissa continued after she graduated from the School.

### D.      Norris and Does 1-3 were on Notice that Rutledge had a Propensity to and Had Sexually Abused Other Miss Hall's Students

47.      By the time Melissa arrived at the School in 2007, Norris and Does 1-3 and/or other prior administrators were on notice that Rutledge was a sexual predator who had groomed, harassed, and/or abused students for over a decade. Examples of notice, which Melissa has only recently learned about, follow:

      a.      Reports of Rutledge exploiting Miss Hall's students were rampant on campus and were dismissed as "gossip," ignored or not properly investigated.

8

b.    In the fall of 1994-1995, a student ("Student A" who was also abused by Rutledge) told the then Head of School, Trudy Hall, that she felt threatened by Rutledge.

c.    In 1997, a Miss Hall's student was not allowed to participate in Miss Hall's graduation after being brought before a disciplinary committee for stating at a Miss Hall's senior class meeting that she believed that Rutledge was having sex with a student.

d.    In student yearbooks, Rutledge wrote overly familiar and inappropriate public missives to students. These were not handwritten notes that Rutledge wrote privately in a particular student's yearbook; rather they were Rutledge's typed messages that were published as part of the yearbook. For example, in 2003, he wrote to one student ("Student B" who he also abused), about *"running together in the ever darkening dusk"* separated from the rest of the team and that student *"confessing her fears"* to him. In the School's 2005 yearbook under the cross-county team photograph, Rutledge referred to the same student as his *"co-pilot"* and writes about *"missing her heart."*

e.    In the fall of 2004, a Miss Hall's student walked into Rutledge's classroom and witnessed Rutledge with Student B's legs draped over his and massaging her breasts. That student reported to former Miss Hall's employee and administrator Sarah Virden.

f.    In the fall of 2004, Rutledge wrote a public comment in Student B's report card about running alone with her off-campus and their "friendship." In the spring of 2005, Rutledge wrote the following public love letter to Student B in her report card:

*"I've enjoyed her voice enormously over the course of the past couple of years, and I looked forward to seeing her every day. To me, she is irreplaceable, and I'm so sad to see*

*her leave. I will miss my runs with her, especially, but in the many other ways she has shown me real kindness, and that's something I will not soon forget."* He also publicly admitted to visiting Student B at her home *"for a weekend"* in her report card.

        g.     In the spring of 2005, a school nurse reported to Norris "red flag" behavior of Rutledge when she witnessed him talking privately to Student C (identified above as the student whose parents wrote to Norris about Rutledge's "unmistakably inappropriate" behavior toward her).

        h.     At graduation in 2005, a 2005 graduate told the then Dean of Students that Rutledge *"kissed Student B and told her that he loved her."*

48.     Despite knowledge that Rutledge was a sexual predator who had engaged in the misconduct above, Norris and Does 1-3 failed to take any action to prevent him from grooming, violating boundaries, sexually harassing, sexually abusing, and otherwise engaging in sexual misconduct with and exploiting Melissa, or to warn her.

49.     Prior to the time that Melissa was sexually abused by Rutledge, Norris, Does 1-3 and other faculty and administrators were also aware that Miss Hall's not only allowed but also normalized dangerous and boundary violating behavior by faculty/staff toward students. As examples only:

        a.     a culture of favoritism existed at Miss hall's whereby certain faculty including Rutledge and Sarah Virden treated certain students as special;

        b.     students were allowed to be alone with faculty/staff, day or night, in classrooms (including behind closed doors), off campus, and in faculty/staff apartments. Faculty/staff were allowed to take students alone, off campus, in cars. Students were allowed to sleep over at faculty/staff members' rooms/homes. Among others, Sarah

Virden frequently hosted students in her room for sleepovers. Faculty – including Rutledge – were allowed to visit students at their homes and stay overnight.

      c.      faculty/staff and students were publicly overfamiliar and physically intimate with each other. Among other things, faculty/staff allowed students to drape their legs over faculty laps and lay down together to watch tv; and

      d.      faculty/staff, including male faculty like Rutledge, were assigned to conduct nightly checks of student dorm rooms. There was no oversight and Rutledge was permitted to and did enter students' rooms to engage them in conversation.

50.     Melissa is under 53 years old. Her claim against Rutledge (Count I) is, therefore, timely pursuant to GL c 260 §4C.

51.     Melissa did not make the causal connection between a) Rutledge's sexual abuse and her psychological and emotional injuries; and b) the negligence, actions, and inactions of Miss Hall's, Norris and Does 1-3 and her psychological and emotional injuries until within seven years of the filing of this Complaint. Her claims against Norris and Does 1-3 (Counts II, IV and V), and Miss Hall's (Count III) are, therefore, timely under GL c. 260 §4C ½.

## <u>COUNT I</u>
### (Assault and Battery against Rutledge)

52.     Melissa repeats and realleges paragraphs 1 through 51 as if fully set forth herein.

53.     Melissa enrolled at Miss Hall's when she was fifteen. Rutledge was Melissa's teacher and later also became her advisor. At all times, Rutledge was in a position of power and control over Melissa. Rutledge had a "special relationship" with Melissa to protect her from injury and harm.

54.    Rutledge repeatedly sexually assaulted and raped Melissa for his own sexual gratification without her consent. Indeed, Melissa could not give her consent given Rutledge's position of power and control over her.

55.    As a result of Rutledge's sexual assaults and rapes, Melissa has suffered and continues to suffer severe emotional distress and other psychological injury, pain and suffering, and consequential damages.

## COUNT II
### (Negligent Supervision and Retention Against Norris and Does 1-3)

56.    Melissa repeats and realleges paragraphs 1 through 55 as if fully set forth herein.

57.    In their capacity as administrators, Norris and Does 1-3 had a duty to supervise and/or monitor the performance and behavior of Miss Hall's employees, including Rutledge, to protect the student body from harmful, intentional, negligent and/or sexually abusive acts of its employees.

58.    Norris and Does 1-3 knew, or in the exercise of reasonable care should have known, that the system of supervising Miss Hall's employees was not in accordance with good employment practices and was likely to provide potential sexual predators like Rutledge with opportunities to abuse students in their care including Melissa.

59.    Norris and Does 1-3 knew, or in the exercise of reasonable care should have known, that Rutledge was and had been grooming, engaging in boundary violations, sexually harassing, sexually abusing and otherwise engaging in sexual misconduct with Miss Hall's students.

60.    Despite this knowledge, Norris and Does 1-3 allowed Rutledge to have access to Melissa and enabled him to sexually abuse her. They allowed him to: be alone with Melissa after

class and at night, on and off campus; host Melissa for sleepovers at his home; and travel to her family's home in Connecticut to convince her to stay at Miss Hall's.

61.    Norris and Does 1-3 breached their duty to Melissa by failing to properly supervise and/or monitor Rutledge and/or prevent him from grooming, engaging in boundary violations, sexually harassing, sexually abusing and otherwise engaging in sexual misconduct with Melissa.

62.    In their capacity as administrators, Norris and Does 1-3 also had a duty to terminate the employment of any sexual predator, including Rutledge.

63.    Norris and Does 1-3 knew, or in the exercise of reasonable care should have known, that Rutledge was not a fit person to maintain a position where he had access to teenage girls, including Melissa, particularly in a boarding school environment like Miss Hall's.

64.    Norris and Does 1-3 knew, or in the exercise of reasonable care should have known, that Rutledge was and had been grooming, engaging in boundary violations, sexually harassing, sexually abusing and otherwise engaging in sexual misconduct with Miss Hall's students including Melissa on and off Miss Hall's campus and that his employment should have been terminated.

65.    Despite Norris's and Does 1-3's knowledge, they negligently retained Rutledge in breach of their duty to Melissa.

66.    As a result of Norris's and Does 1-3's negligent failure to supervise and negligent retention of Rutledge, Rutledge groomed, violated boundaries, sexually harassed, sexually abused and engaged in other sexual misconduct toward Melissa and Melissa suffered and continues to suffer severe emotional distress and other psychological injury, pain and suffering, and consequential damages. But for their negligence, Melissa would not have suffered the

injuries alleged. In the alternative, Norris's and Does 1-3's negligence was a substantial factor in causing Melissa's injuries.

## Count III
### (Violation of GL 214 §1C Against Miss Hall's)

67.     Melissa repeats and realleges Paragraphs 1 through 66 as if fully set forth herein.

68.     Pursuant to GL c 151C §2(g), "[i]t shall be an unfair educational practice for an educational institution... [t]o sexually harass students in any program or course of study in any educational institution."

69.     General Laws c 214 §1C provides the enforcement mechanism for GL c 151C §2(g), which gives the court the jurisdiction to enforce "the right to be free from sexual harassment, as defined in chapter 151C."

70.     While attending Miss Hall's, Melissa had a statutory right to be free from sexual harassment by Miss Hall's employees including Rutledge.

71.     Rutledge's acts of grooming, violating boundaries, sexually harassing, sexually abusing and otherwise engaging in sexual misconduct toward Melissa constitutes sexual harassment in violation of GL c 151C §2(g). Miss Hall's is strictly liable for Rutledge's sexual harassment of Melissa.

72.     As a result of the sexual harassment described in this Count, Melissa has suffered and continues to suffer severe emotional distress and other psychological injury, pain and suffering, and consequential damages.

## <u>COUNT IV</u>
### (Negligent Supervision Against Norris and Does 1-3)

73.    Melissa repeats and realleges Paragraphs 1 through 72 as if fully set forth herein.

74.    At all relevant times, Miss Hall's had a special relationship with Melissa and Norris and Does 1-3 were duty-bound to supervise her and protect her from foreseeable harm including grooming, boundary violations, sexual harassment, sexual abuse and any other sexual misconduct from Miss Hall's employees, including Rutledge.

75.    Norris and Does 1-3 knew or should have known, prior to the time that Melissa was sexually abused and raped by Rutledge, that Rutledge was a sexual predator who had a propensity to and had engaged in grooming, boundary-violations, sexual harassment, sexual abuse and other sexual misconduct of Miss Hall's students. Despite this knowledge, they failed to properly supervise and protect Melissa in breach of their duty to her. Among other things, Norris and Does 1-3:

      a.    allowed Rutledge to be alone with Melissa off campus and in his classroom, oftentimes at night;

      b.    allowed Melissa to sleep over at his campus home;

      c.    failed to properly educate Miss Hall's students, including Melissa, about sexual education, sexual harassment, sexual assault, grooming, proper boundaries, and other sexual misconduct;

      d.    failed to heed warnings that Rutledge was engaged in boundary-violating behavior, grooming and other sexual misconduct with students, including Melissa;

      e.    allowed Rutledge to have special access to Melissa as her teacher, advisor and mentor; and

15

      f.     put profits over Melissa's safety by allowing Rutledge to visit her family home in Connecticut to convince her to remain enrolled at Miss Hall's.

76.    As a result of Norris's and Does 1-3's negligence, Rutledge groomed, violated boundaries, sexually harassed, sexually abused and engaged in other sexual misconduct toward Melissa and Melissa has suffered and continues to suffer severe emotional distress and other psychological injury, pain and suffering, and consequential damages. But for their negligence, Melissa would not have suffered the injuries alleged. In the alternative, Norris's and Does 1-3's negligence was a substantial factor in causing Melissa's injuries.

### COUNT V
### (Negligence Against Norris and Does 1-3)

77.    Melissa repeats and realleges Paragraphs 1 through 76 as if fully set forth herein.

78.    At all relevant times, Miss Hall's had a special relationship with Melissa and Norris and Does 1-3 were duty-bound to protect her from foreseeable harm, including grooming, boundary violations, sexual harassment, sexual abuse, and other sexual misconduct by Miss Hall's employees, including Rutledge.

79.    Norris and Does 1-3 knew or should have known that Rutledge had a propensity to engage in boundary-violating behavior, and sexually groom, harass, and/or abuse Miss Hall's students, including Melissa.

80.    Norris and Does 1-3 breached their duty to Melissa by, among other things:

      a.     allowing a culture to exist at Miss Hall's in which faculty/staff boundary - violating behavior was normalized;

      b.     allowing a culture to exist at Miss Hall's in which reports of grooming, boundary violations, sexual harassment, sexual abuse and/or sexual misconduct by Rutledge were ignored and/or not investigated;

16

c.      failing to properly train faculty/staff and students about grooming, boundary violations, sexual harassment, sexual assault and sexual misconduct of any kind, how to recognize such misconduct and how to prevent it;

d.      failing to properly train faculty/staff about how to report grooming, boundary violations, sexual harassment, sexual assault and sexual misconduct of any kind internally and to law enforcement and/or Massachusetts Child Protection as required by GL c. 119 §51A;

e.      failing to properly train faculty/staff about how and under what circumstances to investigate grooming, boundary violations, sexual harassment, sexual assault and sexual misconduct of any kind;

f.      failing to report Rutledge to law enforcement or to Massachusetts Child Protection as required by GL c. 119 §51A; and

g.      failing to warn students, including Melissa that Rutledge had engaged in grooming, boundary violations, sexual harassment, sexual assault and/or sexual misconduct with others.

81.     As a result of Norris's and Does 1-3's negligence, Rutledge groomed, violated boundaries, sexually harassed, sexually abused and engaged in other sexual misconduct toward Melissa and Melissa has suffered and continues to suffer severe emotional distress and other psychological injury, pain and suffering, and consequential damages. But for their negligence, Melissa would not have suffered the injuries alleged. In the alternative, Norris's and Does 1-3's negligence was a substantial factor in causing Melissa's injuries.

WHEREFORE, plaintiff Melissa Fares requests that this Honorable Court:

a.      Enter judgment on all Counts in her favor, and against Defendants;

b.      Award damages in an amount deemed just by this Court, plus interest, attorneys'

fees, costs and other expenses;

c.      Grant all such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.


Respectfully submitted

Plaintiffs,
Jane Doe 1 and Jane Doe 2,
By their Attorneys,


 */s/ Kristin M. Knuuttila*
Kristin M. Knuuttila, BBO# 633828
KNUUTTILA LAW LLC
144 Gould Street, Suite 202
Needham MA 02494
617 600 3010 / kmk@knuuttilalaw.com


 */s/ Roderick MacLeish*
Roderick MacLeish, BBO# 311880
MACLEISH LAW LLC
467 US Rte 3
Holderness NH  03245
617 600 3010 / ericmacleish@macleishlaw.com

January 9, 2025

<u>CERTIFICATE OF SERVICE</u>

I, Kristin M. Knuuttila, hereby certify that I have served a copy of plaintiff's Amended Complaint on the following counsel of record by emailing same this 9th day of January 2025:

Gregory A. Manousos
Robert Papandrea
MORGAN, BROWN & JOY, LLP
200 State Street, Suite 11A
Boston, MA 02109-2605
*gmanousos@morganbrown.com*
*rpapandrea@morganbrown.com*

James I. Glasser
Joseph C. Merschman
Armando Ghinaglia, Esq.
WIGGIN AND DANA LLP
265 Church Street
New Haven, CT 06510
*jglasser@wiggin.com*
*jmerschman@wiggin.com*
*aghinaglia@wiggin.com*

Nora R. Adukonis
Stephen J. LaMonica
LITCHFIELD CAVO LLP
6 Kimball Lane – Suite 200
Lynnfield, MA 01940
*adukonis@litchfieldcavo.com*
*lamonica@litchfieldcavo.com*

*/s/ Kristin M. Knuuttila*
Kristin M. Knuuttila

19

Tab 2



Hilary Simon and Melissa Fares, photographed in Far Rockaway, New York. PHOTOGRAPH BY MARK SELIGER.

GIRLS, INTERRUPTED

# The Sex Abuse Scandal That's Rocking Miss Hall's, an Elite Berkshires Boarding School for Girls

Founded in 1898, Miss Hall's School appears to be a cocoon of safety. But for decades, an alleged sexual predator operated on campus. Alumnae are speaking out in hopes of holding their former teacher—and the school—accountable.

BY **EVGENIA PERETZ**

JANUARY 16, 2025



SAVE

**Listen to this story**



00:00                                                                                              43:20
1x

**M**att Rutledge was watching television with Annie, his wife of 35 years, when the bombshell phone call came in.

On the other end was Julia Heaton, the head of school at Miss Hall's—the small all-girls boarding school across the street, in Pittsfield, Massachusetts, where for three decades—since 1991—Rutledge had been the star history teacher and a charismatic face of the school. Heaton had bad news to share: The school had received a letter accusing Rutledge of sexual misconduct with a former student. Frantic, he texted Hilary Simon, his former student and advisee. "[If] this is related to you and me," he wrote, "I am SO sorry.… I am not sure how to conduct myself here, other than knowing that I can only offer a blanket denial and decline the opportunity to say more than that to anyone who asks to speak to me…. I'm shaking as I type this, because I'm terrified, of course, but I don't really know what else to do." As she read it, Simon was shaking. She thought she'd die with their secret—that when he was 40 and she was 15, he'd sought her out and eventually began a sexual relationship that lasted well into her 20s. He'd cajoled her, obsessed over her; she was sure she was the only one. By the end of their exchange, in spite of herself, she found herself telling him she'd find out what she could.

A problem like Rutledge was the kind of thing that elite educational institutions swept under the rug in the 1980s and '90s. But by the 2010s private schools across the country had begun reckoning with instances of sexual abuse by faculty members. Astonishingly, Miss Hall's seems to have made the gamble to keep silent even as the world around it changed. (The school declined to respond to *Vanity Fair*'s questions pending an ongoing investigation.) Now stories about Rutledge are flooding out from a group of brave women, going back decades, and they all bear striking similarities in their specific patterns. Their stories are similar in another way, too, in that they center on the most vulnerable part of girlhood and of growing up, the time when a person's beliefs and identity are taking shape. And if that vulnerability is pierced, it can shatter a life forever.

"**I still struggle** with feelings of shame and self-disgust. That's a big one lately," says Melissa Fares, who, until the past boiled up and sent her life sideways, was a reporter at Reuters. We are in the kitchen of her childhood home in Wilton, Connecticut, where Rutledge once read to her from *Pooh and Friends* on the floor as she, then 16, fell asleep on his shoulder. She's warm and down-to-earth, wearing shorts and a tie-dyed sweatshirt. Wine is on hand if needed, she tells me.

Her sharp, spirited, and slightly nervous mother, Kristina, bustles in and out from her cigarette breaks on the hammock overlooking her gardens. She fixes drinks and sandwiches, then stops in her tracks and asks whether Melissa really wants her there. Melissa assures her that she does. Rutledge got his hooks into Kristina too, much to her embarrassment. And at this point there's no detail her mother can't hear—though at one time Fares, like Hilary Simon, thought she'd die with her secret too. "I feel disgusted, obviously, mostly by him," says Fares. "But there's part of me that feels like he injected his shame into me, that's just lasted for so many years," she says. "He was inside of me, inside of me physically, but literally infiltrated my life, my family's life, my mom's life, my dad's life, my brother, everybody."

~~$2.50~~ $1 per month for 1 year + a free tote.
~~$2.50~~ $1 per month for 1 year + a free tote.

**Subscribe Now ›**

In 2006, Fares was 14 and felt lost in the crowd at the public school she was attending. She told her parents that she wanted more academic attention and became fixated on going to boarding school. Her strict father, Nabil, an émigré from Lebanon, was reluctant but agreed under the condition that it be an all-girls school. After the family visited a few, one rose to the top—Miss Hall's. The idyllic Berkshire jewel, with fewer than 200 students in the student body and a price tag of up to $72,000 for a year of tuition, had an attractive pedigree. Founded in 1898, it was the first all-girls boarding school in Massachusetts. Like Miss Porter's, Emma Willard, and other historic all-girls schools that dot New England, it promised—still promises—women's empowerment in a testosterone-free environment. But Jeannie Norris, then the head of school, touted a specific brand of women's leadership, rooted in what one alumna calls "respectability politics." Being "ladylike" was important. Gossiping about one's elders was sacrilege. Issues around sex and sexuality were circumscribed. For any parent hoping for a safe, cosseting environment, this one seemed to fit the bill. On their visit, the Fareses were invited to sit in on the American history class of Matt Rutledge, who had knocked their socks off with his charisma. The Fareses were sold.



Fares, Rutledge, and Fares's mother during a family trip to Wilton. COURTESY MELISSA FARES.

Miss Hall's wasn't the easy transition Fares had hoped for. Coming in as a sophomore, she found it hard to make friends. Rutledge, her history teacher, immediately identified that loneliness. He acknowledged how tough it must be for her. Focusing on her work would help her, he said. "He promised he could make me a better writer, which was huge for me," Fares says now. His attention was a jolt. She'd been aware of his special status at the school since the day the Fareses had toured. He was a family man, he made sure people knew. A photo of his wife and kids hung outside his classroom, and his two daughters attended the school. Tall and imposing, he played a lot of hockey in the local league in Northampton. He had a cultured side too. He wrote poetry, and he told people he worked for Tanglewood Music Center, including in the summers while their fellows stayed in Miss Hall's dorms, where he was a residential director—but he was never an employee of the TMC. Boldly inhabiting

his Renaissance man persona, he was known to start his first class of the year with, "I'm Matt Rutledge, as you know. I'm smart, funny, charming, handsome, and modest," to a chorus of awkward girlish titters. He strutted the halls, rattling off inside jokes to any student who might pass, sometimes calling out, "Make way for Mr. Wonderful." The comically over-the-top bluster was part of the charm, or so it seemed to Fares.

Others, including many of the teachers, had a hunch that his arrogance was compensating for insecurity. "He had a shit childhood," says a former teacher who knew him well, pointing to parents who divorced when he was young and an absent father. His academic bona fides weren't especially sparkly: Berkshire Community College and University of Massachusetts Amherst. He started a PhD program at UMass, writing about the Gilded Age mansions of the Berkshires, but didn't complete it. He'd harbored dreams of being a writer, but they never panned out. "He was a big fish in a small pond," says another former faculty member. "That's how we thought of him. As kind of pathetic and insecure. He was only strong within those walls."

**T**o Fares, Rutledge was the big man on campus, bar none. She began going to his study halls in his classroom, where she says they'd usually be alone. On such evenings he'd outfit his room with debonair touches: snacks like dried cherries, raw almonds, and fancy dark chocolate from Canada, where he had a cabin. He'd have cool music playing—Stevie Ray Vaughan, the Police, Van Morrison. He'd encourage her to take a nap if she was sleepy. He thrilled in the size differential, it seemed. "I don't want to say twice my height, but he towered above me," says Fares, who is five foot four. He began to call her "Little One" and would comment, for instance, "Such a big sigh for such a little girl." (Rutledge did not respond to detailed questions from *Vanity Fair*.)

As their sessions continued, his conversation became more daring. "You're my type," he told her one evening: "dark hair, dark eyes, like Penélope Cruz or Salma Hayek."

"*Penélope Cruz?*" she remembers thinking, "I'll take it." He'd share stories about his own youth, blighted by drugs and bad characters, and the sad state of his marriage—he and his wife hadn't had sex for ages. Then he'd drop in a question about her boyfriend back home. "He asked if he had performed oral sex on me," she recalls. He'd put his legs up on the table and encourage her to rest her legs on his. He began giving her mixtapes, with songs like "Sweet Thing" by Van Morrison, "Fields of Gold" by Sting, "[Let's Give 'Em] Something to Talk About" by Bonnie Raitt. Pulse racing, she'd study the lyrics for signs of his desire. On Friday-night school trips to the Berkshire mall, he drove the van and had her sit beside him, with the other girls in the back. He'd have one hand on the wheel and the other on her thigh. "I'm thinking, This man has lost his mind," Fares recalls. "He must be obsessed with me. He can't resist me. He's taking these chances."

---

## Cocktail Hour newsletter

Get essential culture, news, and style, every day.

SIGN UP

By signing up, you agree to our user agreement (including class action waiver and arbitration provisions), and acknowledge our privacy policy.

Even with the heady emotional rush, Fares's loneliness hadn't subsided, and she was having doubts about returning the following year—which posed a problem for Norris. The board had hired Norris in 1996, when the school was in dire financial straits and student retention was a serious problem. Norris, polished and formal, was remarkably successful in turning things around—raising $55 million in capital campaigns over what would ultimately be 16 years at the helm, for example—and she was determined not to let the school backslide. In the spring of 2008, Norris met with Fares's parents to discuss her happiness. As Kristina Fares recalls, Norris asked if

there were any teachers with whom Melissa was particularly close who might encourage her to stay on. "Matt Rutledge," Kristina replied. She and Nabil had gotten to know him themselves; they'd even gone out to dinner with him on their visits to see their daughter—he'd been so helpful with her writing. Then it was settled, Norris advised. You two don't press, she suggested to the parents. Let Rutledge take the lead. (Norris did not respond to questions from *Vanity Fair*.)



The grounds of Miss Hall's School.
BEN GARVER/*BERKSHIRE EAGLE.*

That summer, the Fares family invited him to visit their house in Wilton. Melissa sat by the guest cottage where he was to stay, anxiously awaiting his arrival. Rutledge came bearing gifts—a sun hat for Kristina, an avid gardener; a book by the erudite British author Simon Winchester for Nabil; *Pooh and Friends* for Melissa. Melissa had her own gift to impart: a leather-bound scrapbook she'd made featuring images of cows—an inside joke, as he had a thing for cows and would mutter "*mooo*" when Melissa said something he liked. When she gave it to him, tears formed in his eyes—

the scrapbook was a sign that she'd be back in the fall. The next morning they went for a walk, and he took her hand as they strolled. When they got to a secluded dead end, he gave her a lingering embrace, so long that she braced excitedly for a kiss. He held off for now. For the rest of the weekend, he gardened with Kristina, played guitar with Melissa's brother, Emile, and talked college prospects with Nabil. Rutledge and the family enjoyed a hot tub together. They all went out for a sushi dinner, and he placed a hand on Melissa's leg under the table—a thrilling act of illicitness that promised more to come. "You stuffed me to perfection," he wrote in his four-page thank-you letter to the family.

Upon Fares's return her junior fall, Rutledge became her adviser, signing off on her comings and goings and steering all of her relationships. He eagerly encouraged a new friendship with his younger daughter, who was a grade below and played defense with her on varsity soccer. As the two girls grew closer, he naturally saw more of Fares. One day that fall, he took the girls to Great Barrington for ice cream. They found a creek bank to enjoy it on, and Rutledge's daughter sat in front of them. Fares sat near his casually splayed-out legs. Then, right behind his daughter's back, literally, he kissed Fares for the first time. "I was shocked. But I guess I just went with it, because, what else am I going to do?" she says, perhaps voicing exactly his calculus. Whatever Fares's fears, they were eclipsed by her sense of intoxication. "There's something about me that he loves and it makes you feel like you're walking on water," she recalls. They were each other's protectors, he insisted, and the stakes couldn't be higher. "If you ever tell anyone, I will kill myself," he told her. He was quick to cover their tracks, instructing her how to delete instant messages. But Fares didn't realize that their relationship was becoming evident to others. Her schoolmate Bethany Fusini (now Bethany Whitney, class of '11) recalls the sight of them pulling up in the van together, side by side, with his daughter in the back. "It just felt like he was with his girlfriend," Whitney says.

During the same time period, he began corresponding with Fares's mother in long emails. He wove together guileless-sounding personal anecdotes about, say, Easter egg

hunts gone awry; snippets intended to show his propriety—"Melissa's birthday is coming up!… I'd like to give her a couple of little things…. Please let me know if you would prefer I didn't, okay?"—and, read in a certain light, romantic-ish phrasing. "My dear Kristina." "I'm glad to make you smile, of course, it makes me happy to do so!" "Hugs and kisses." He sent her his poetry (which he hoped *The New Yorker* would publish), a young birch tree to plant, and a Stevie Ray Vaughan CD collection. "I was a sucker," admits Kristina. "I fell right into it. I was in the right frame of mind to welcome the attentions of an attractive man who, PS, was really helping my daughter."





Rutledge and Fares in Wilton, Connecticut, in the summer of 2008. COURTESY OF MELISSA FARES.

He was still working on Melissa too. One fall morning at dawn—his favorite time of day, he'd told her—she showed up at his classroom, as instructed, wearing her pajamas. He met her at the doorway, locked the door behind her, pulled down the shade. He told her to get under a classroom desk, took off her pajamas, and performed oral sex on her for the first time. A few months later, just after she had turned 17, the instructions got more elaborate. *Come in your pajamas, but first go to the laundry room*—located next to the classroom—*and put in a load of laundry.* A plausible excuse. This time he brought her to the closet, where he'd laid down a yoga mat, and he raped her. That's not what she called it at the time, but it was the first time she felt a sense of having been violated.

"People ask me, 'Well, was it consensual?' And I'm like, How do you give consent at that age, in that context? He's a big guy and was just forceful. So I didn't say anything. And he came inside me." She bled, and she panicked—she wasn't on birth control. He assured her that he'd had a vasectomy, a term she'd never heard before. But if she wanted to have a baby with him, it could be reversed, he said. She went back to her dorm, googled "vasectomy," and breathed a sigh of relief.

**A**s junior year turned to senior year, the sex became frequent and he introduced her to alcohol—bottom-shelf Evan Williams whiskey—encouraging her to take shots and imagine she was "tasting the woods." He'd have sex with her in his guest room while his wife and daughters were sleeping. Rutledge again visited the Fares family in Wilton, this time with his daughter. Fares and the daughter shared Fares's bedroom, but Fares sneaked into the cottage, which he had dubbed the Rutledge Cottage, to have sex with him.

In 2010, when Fares was 18 and ready for college, she chose Smith, in Northampton, in part to stay close to him. The relationship took a darker turn still. He'd steal away from Pittsfield on a Sunday, telling his family he was going to hockey practice. He'd show up at her dorm with cases of wine. This was the beginning, she says, of her dependency on alcohol, something she would struggle with for years. He'd take her to the North King Motel, where he paid in cash. On occasion he'd give her baby-doll-style nighties. As she'd perform oral sex on him, he would film her from his laptop. "This is all I have to remember you by," he'd tell her. He assured her the files were encrypted. Other nights the action happened in his car. "He'd want me to suck his dick"—she apologizes for the word—"drive me around, go to the hospital parking lot, give me a shot of whiskey, and make him orgasm, and then drop me back off." The thrill had turned into hollow degradation. She thought about telling friends, but the threat of him taking his own life continued to loom. She became increasingly isolated, routinely lying to her friends about her whereabouts. On nights when other girls were out socializing with one another, she often stayed in her room, alone, drinking the bottles of wine he'd brought her.

> *"The shame I feel is also his shame. And that's what predators, I think, do. THEY TAKE THEIR SHAME, THEY PUT IT ON YOU, AND YOU HAVE TO CARRY IT."*

By the time Fares reached her 20s, she tried to break his hold and see other men. But Rutledge did what he could to stop her. He gave her a vibrator and told her she didn't need to explore other relationships—just use it and think of him. She moved to New York in 2014 to attend Columbia Journalism School, where she met a man she started dating. Rutledge created a fake Instagram account to follow her and saw a picture of them together. She recalls one night when she was in a taxi going to meet the new boyfriend. "He called me and he was screaming and crying. He was so hysterical," she says. "Completely unhinged. 'How could you do this to me?' " Fares, now 32, finally saw his monstrousness and repellence. But the damage felt

irrevocable. She struggled in one relationship after another, often freezing during sex or dissociating. For a time she could only perform the act while intoxicated. As she bluntly puts it, "I always say, or have said to people recently, I don't know how to make love. I know how to fuck." At her fifth Miss Hall's reunion, she had sex with him for the last time, at his mother's house. "I just felt so little of myself."

As Fares eventually entered therapy, some truths about herself and her experience began to crystallize. "Why am I so good at lying? Well, he was so good at lying. Why do I feel so much shame? Well, the shame I feel is also his shame. And that's what predators, I think, do. They take their shame, they put it on you, and you have to carry it." One day in 2019, her story came tumbling out to her mother, and then to her brother. (Nabil, who died in 2021, had developed dementia, which spared Fares from having to tell him.) Kristina was heartbroken for her daughter, crushed with guilt for not seeing what was in front of her. She supported her in how she wanted to proceed with her story. Melissa knew coming out publicly would hurt Rutledge's daughter, with whom she had remained friends, and so she held back. But last March, she felt the need to speak up despite that friendship. "I felt like I had forgiven myself enough to be able to come forward and speak from a place of, not authority, but some profound experience that this was not my fault, and this needs to be discussed. This man needs to not be able to teach ever again."

Through a lawyer, Fares sent a letter to the current head of school, Julia Heaton, who began in 2014, and told her the headlines of her story. At the same time, she reached out to a woman she didn't know but whose name she had heard—Hilary Simon, née Casper, class of '05. While Fares was at Miss Hall's, she'd heard whispers that he'd had a relationship with Simon when Simon attended the school five years earlier. Fares recalls googling her back then. Simon was petite, with dark hair, dark eyes, just like her. At the time, Fares asked Rutledge about her, but he denied any involvement. He loved only her, he insisted, and this was his first time doing anything of the kind. Fares accepted it, but doubt nagged at her. Now, 15 years later, Fares decided to put out feelers to the woman—maybe she'd had an experience similar to her own.

**T**hat is where this story began. On the same morning that Simon received the frantic text from Rutledge, she went into her office, an insurance law firm in New York, and stared at the email from the lawyer representing Melissa Fares, a name she'd never heard of, asking to talk. She felt like she might throw up. It was now clear to her that Fares was the woman behind the complaint to the school. Her first reaction was jealousy—even though Simon was now married with a three-year-old child. She promptly called Rutledge and unloaded: *Who is Melissa Fares?!* Rutledge tap-danced on the phone, claiming Fares had been just the result of a midlife crisis and his unhappy marriage. And then Simon went into protection mode as she had so many times before. She promised to collect information from Fares and report back.

Simon, now 37, called Fares. But just moments into their conversation, hearing the voice of the young woman on the other end of the line, "a switch went off," says Simon. She found herself saying, "I've been waiting for this call for 20 years." As she listened to Fares's story, a wave of sorrow fell over her: "I just remember feeling so sad that I didn't protect her, that I didn't stop him." Simon shared her story back. For both women the sense of specialness they both once felt was peeled away. Their stories were twin accounts five years apart and overlapping, marked by the same plot points and scenes. But there was a new angle to Simon's story—evidence that the school knew the truth about Rutledge and did nothing to stop him.

Much like Fares, Simon is warm and intelligent, with a hint of grief behind a pretty face. Notes and photos of her with Rutledge sit in tidy piles on her dining room table; in them she's baby-faced, eyes twinkling, barely up to his shoulder. Looking at one, she says that she's telling her story, at least in part, for *that girl* whose future he stole. Like Fares, 14-year-old Simon found it hard to make friends when she arrived at Miss Hall's in 2001. She was dealing with a family member's mental health issues that required all her parents' attention. "I was still reeling from a childhood of chaos and violence," she says.

> *In the front seat of the van, he'd have a hand on her thigh. There were mixtapes, the IMs and letters, which said things like "I FEEL LIKE A DROWNING MAN. I WANT TO BREATHE YOU IN."*

That first year Rutledge, the faculty member on check-in duty at the dorm, always made a special effort to talk to her from the doorway as she settled into bed, which she found comforting. As with Fares, when she wavered on whether to return the following year, he successfully persuaded her to do so. He became her adviser and cross-country coach that year. In that capacity he orchestrated one-on-one runs together, taking her to state forests Kennedy Park and October Mountain. As he did with Fares, he fetishized her smallness—he'd bend down to tie her running shoe and called her "Little One." It was here, on these secluded paths, that he began sharing personal stories of his troubled youth, just as he would do with Fares, and opening up about his unsatisfying marriage. She recalls admissions director Kim Boland giving her a peculiar admonishment when she drove off-campus with him in the van: "Be a good girl for Mr. Rutledge." (Boland did not respond to questions sent to Miss Hall's School.)

Then came the touching—in his one-on-one study halls, where he'd play music and have her drape her legs over his; in the front seat of the van, where he'd have a hand on her thigh while other girls were in back. There were the mixtapes, the IMs and letters, which said things like, "I feel like a drowning man. I want to breathe you in." Cherish them, he told her, but delete or shred immediately. There was the same charming of her parents with gifts and gushing prose about their daughter, as if daring to hint at their secret: Her daughter, he told them in a typical report card, "was the whole package." Their daily runs, he wrote, helped him out of his "blue funk." There was the same thrill he got by mingling with them and taking risks behind their backs. He took Simon and her parents to Tanglewood, where Rutledge kissed her in a wooded area. Two small children happened to be running by, and they stopped to look. Simon tried to push him away, but he pulled her closer: "I want them to watch us. They need to learn." There was the same urgent promise to keep

quiet—that if she ever told anyone, he'd kill himself. As with Fares, "He just created a perfect scenario to isolate me and possess me," she says. "I felt like all I needed was him." Despite her isolation, the relationship was evident to many, as it would be with Fares. "He was always with Hilary, in the book locker room or the hallway," says Jo Zuber, class of '07. "People would talk about Hilary having an affair with Mr. Rutledge."

In the fall of Simon's senior year, a classmate walked in on her and Rutledge in one of his study halls to find them cuddled together, his hands up Simon's shirt. Simon ran out of the room, but the classmate remained and laid into him. "'I'm going to report you,'" the classmate recalls telling Rutledge. "'I saw what you did. I'm going to tell the police.'" Rutledge went at her, telling her that he'd ruin both her and Simon's chances of getting into college. "'Nobody's going to believe you. And Hilary won't say a word.'" The classmate broke down in tears and left. Walking through the campus, the sobbing girl was spotted by the college counselor, Sarah Virden, an outsize force at the school who'd been there since the '90s and whose lifeblood was girl drama. According to several alumnae, Virden often had certain girls over at her apartment adjoining the dorm to watch TV and hang out in the evenings. The classmate told her what she'd just seen. Virden asked no further questions and curtly replied, "You should be in your room." (Virden did not respond to requests for comment.)

Several months later, on Simon's graduation day, a similar incident occurred. Rutledge took Simon to his classroom alone, kissed her, and told her he loved her. Afterward, a classmate saw Simon crying and she told the classmate what happened. The classmate reported this to the dean of students. According to Simon, who later learned about the turn of events, this time word got up to the assistant head of school, Jenny Chandler, as well as Norris, who called him in. Rutledge denied it, and they accepted it. He promptly told Simon that he would commit suicide *that day* if she admitted to it. But no one from Miss Hall's ever followed up with Simon or notified her parents. (Chandler could not be reached for comment.)



Simon with Matt Rutledge at her 2005 graduation.  COURTESY OF HILARY F. SIMON.

Rutledge, then 43, first had sex with Simon on a mattress laid out on the floor of the New York City apartment of his best friend, Joshua Greene, editor of *Wine & Spirits* magazine. She was 18—still a virgin—and had just graduated. (Greene did not respond to requests for comment.) The promise of romance turned dark: As with Fares, it was animalistic and forceful. As with Fares, after he finished, he told her not to worry, that he'd had a vasectomy, but it could be reversed if she ever wanted to

have a child with him. After the act she recalls lying in a fetal position, distressed and confused, against the cold tile of the bathroom floor. "That set in motion a hellish next several years of dark hotel rooms, the bedroom of his school-owned home, his car tarps that he would put out in the woods, back to Josh's apartment, my childhood bedroom, college dorm rooms," says Simon. As with Fares, he'd take Simon to the North King Motel—where he dressed her in the same childlike nighties, read to her from *Where the Wild Things Are* while she lay on his naked body, and filmed her while she gave him oral sex—something to remember her by.

As Simon moved into her 20s, around the time he was first beginning to groom Fares, a tragic kind of clarity came over her one day after they'd had sex in the woods near his house. "I remember seeing this black snake near the tarp and just feeling this deep, deep sadness. And I realize now, I just felt so lost. Is this what love is supposed to feel like? Is this all that I deserve? I realized I was now completely stuck in this secret world with my former teacher, and I just wanted something normal in my life, like a relationship without power imbalance, something I didn't have to hide from everyone, where I didn't feel just isolated in some secret bubble with this man, and I could stop lying to everyone and to myself." Even after she tried to pull away, he monitored her from afar, demanding long emails. When she graduated from law school, an event which was livestreamed, he zoomed in on her and emailed her a video with the message, "I'm still paying attention."

Now, upon sharing their stories, the women wept together, not just for what they went through with Rutledge, but for the school's inaction in protecting them. The day after the women spoke, Simon called Rutledge in what would be their last conversation. It seems he was still hoping to manipulate her into feeling sympathy for his plight: "I'm glad you and Melissa have each other now," he told her. "I'm in absolute crisis…. This is an existential dilemma for me…. It was my fault for losing my mind and for the way that I feel affection…the way I feel love, which is clearly so wrong." He acknowledged that Norris and Chandler knew about his actions—and he seemed to be passing on some of the blame to them. "I think the school should have let me go," he said.

For Fares's part, she waited to see what Miss Hall's would do with the information she'd given them—Heaton had assured her that they "take these matters very seriously." A week later, Heaton sent a short letter to parents announcing Rutledge's resignation and acknowledging his 32 years of service in many roles. No mention was made as to why he was departing. It was a gut punch to Fares. With the support of her lawyers, she steadied herself, went onto the Miss Hall's alumnae page and shared her story. Simon followed two weeks later with her own. Alumnae poured out their support to both women with messages of encouragement and statements of regret. "We all knew," wrote Okichie Davis, class of '08. "We all heard it through the whisper channel when we were there, but it was just never confirmed." As Davis says today, "We didn't have the language to describe child abuse."

The dam has burst. Judging by the accounts of other Miss Hall's students, Rutledge's alleged victims date back to his arrival at the school in the early 1990s. One woman who asked not to be named recalls how he asked her to meet him in the TV room in the basement. She remembers hugging him there and feeling his penis against her, and him touching her vulva and breast over her clothing. He'd sometimes drive her off campus, where he'd put on her seatbelt for her, touching her breast. When they were spotted upon their return to campus, she became nervous that she'd get in trouble and told the head of school at the time, Trudy Hall, about their drives off campus. According to the woman, Hall told her to keep her mouth shut. "I cannot imagine that I would have ever said such a thing to a student who was concerned about her safety," Hall tells *VF,* and says that she is participating in the school's investigation.

Another student from that period recounts how she was virtually parentless when she arrived at Miss Hall's and Rutledge, then a dorm parent, "was the only person that actually hung out with me and asked me how I was doing." On parents' weekend, as she watched a movie in the basement TV room, he came in, cuddled up next to her under the blankets, told her how sad it was that her father wasn't there, and then had sex with her. The next morning, she was bleeding and went to the nurse. "I just had sex with an adult," the girl, then 16, told the nurse, not wanting to get him in

trouble. "We don't say things like that," replied the nurse. She gave her pads and sent her back to the dorm. Rutledge continued having sex with her, including in his own house while she was hired to babysit his children.

To call out his behavior was to risk punishment. In 1997, Norris's first year at the helm, student Lisa Fhagen blurted out in her senior class meeting that "Mr. Rutledge fucked" a fellow student. Fhagen says she was thrown out for "slander." Silence—and silencing—continued to be the order of the day throughout Norris's tenure. In 2009 student Bethany Fusini, Fares's friend, told Norris she suspected that a different teacher was involved with a different student. She says Norris promptly led an assembly about the evils of gossiping and expelled Fusini. "It was always about saving the reputation of the school when other things would happen," says a former teacher. "I remember being in a faculty meeting and being told by the head of school, do not talk about this outside of this meeting. This is the school's business. And do not even talk to your spouses."

On that spring afternoon in 2008, when Norris sat across from Fares's parents and told them how important Rutledge could be for their daughter's future, she made no mention of a letter she'd received from the parents of a recent grad—not anyone mentioned thus far. In the letter, they informed Norris that their daughter had spent her sophomore year getting close to Rutledge, and that recently he had visited her at college, where "his behavior became unmistakably inappropriate. She was not physically harmed, however, she is very upset, and so are we." The parents added, "As we must deal with the consequences of this breach of trust, we know you will want to take the necessary steps to protect other young women and their families from this experience." According to one of the parents, Norris called them in for a meeting and focused on whether they intended to sue; they assured her they did not. Norris said she would take care of the situation, but she never followed up. Perhaps that's why Rutledge tended to speak so highly of Norris, often remarking, according to Simon, "She's always treated me so well."



Rutledge and Simon with her cross-country teammates. MISS HALL'S YEARBOOK.

By 2022 Miss Hall's had dressed itself up with the trappings of female empowerment. The school had a new, younger head—Heaton—and a new motto: Be Bold, which was slapped on its website and capital campaign material. Some alumnae who had suspected Rutledge's misbehavior and been moved by the #MeToo movement took that motto to heart and felt the time had come to say something. Not only was Rutledge still teaching there, he had been given the Leonhardt Family Teaching Chair Award, which honors a faculty member who "possesses the highest personal and professional ethics." At the 2022 reunion Rutledge, red-faced and drunk, stumbled around the reception hall, according to Sushil Sinha, class of '00, a member of the alumnae council. She then joined a group of women, spanning a dozen years at Miss Hall's, who were discussing the sexual relationships he'd had with their former

classmates. Sinha was hearing this all for the first time and became alarmed. The following morning Sinha reported what she'd heard to Heaton. According to Sinha, "She looked me in the eye and said, 'I want to know what's going on in my school.' " Sinha believed the matter would be dealt with.

---

## More From the Archive

**Dangerous Privilege** →



**The Code of Miss Porter's** →



**A Private-School Affair** →



But by reunion weekend 2023, which featured guest speaker Lucia Evans, Rutledge was still working at Miss Hall's. Mary Adamcyk, class of '03, who won an alumnae leadership award that weekend, confronted Heaton with the same information that Sinha had a year earlier. "Are you aware of this?" Adamcyk asked her. Adamcyk got the impression that Heaton was hearing this for the first time. "She just looked at me like a deer in the headlights and shook her head." Heaton told her it wasn't the right time to talk but to call her at a later date. But when Adamcyk tried to reach her the following week, Heaton didn't return her call. During that same reunion Adamcyk asked Virden—who'd allegedly turned away Simon's whistleblowing classmate 20

years prior and who was now dean of students—why a sex abuser was still working there. According to Adamcyk, Virden replied, "I don't see anything. I don't know anything. I don't say anything."

And it doesn't seem like Rutledge was deterred, all the way through the 2024 school year. Jessica Gleason, a parent of a class of '27 student, reports that Rutledge gave special attention to her daughter; after Gleason pulled her daughter for the following year, the school refused to return her deposit. According to a 2024 graduate, Rutledge was still testing the waters as late as last spring, with his hands lingering for too long on girls' shoulders, for example, and sitting uncomfortably close.

After Fares and Simon went public with their stories, Miss Hall's made a statement acknowledging Rutledge's misconduct and notified the authorities about Rutledge. In early April, it hired a small, Maine-based law firm, Aleta Law, to conduct an investigation. The school declined to answer *Vanity Fair*'s questions, citing that investigation, and provided a statement that read, in part: "We are fully committed to learning the truth about what occurred, so that we may extend support to anyone in our community who was harmed and continue our efforts to safeguard our students today and in the future."

Still, members of that community feel the school has fallen short. Faculty member Robert Bolger, who shared check-in duties with Rutledge in recent years, says that he learned about what had happened from local news reports. Concerned, he went into Heaton's office to discuss it. She nervously asked him if he was investigating. (Bolger resigned at the end of the school year.) Most galling to Fares and Simon is that the school has yet to establish a therapy fund for Rutledge's survivors. This, in part, prompted Fares in October to file a civil suit against the school, Rutledge, and multiple administrators. The suit describes a school culture in which "faculty/staff and students were publicly overfamiliar and physically intimate with each other." The suit also alleges that an incident between Rutledge and another student was reported to Virden in 2004.

In October the Berkshire County DA's office announced that it would not be filing charges, citing the age of consent in Massachusetts, which is 16. Fares was in her bed when she read the news online. "I curled myself up into the smallest ball I could and wept." But then she got up and closed the chapter on that girl. "No more feeling small," she told herself. Through her lawyers, she told the DA's office that she didn't accept the decision, that "rape is rape." After a subsequent meeting with Fares, the police announced that the case was ongoing. Though it's unclear whether charges will ultimately be filed, her fire is undimmed. "It's so clear to me now what I deserve, what survivors everywhere deserve, what is just and what isn't," she says. "Once you gain that kind of clarity, there's no erasing it or looking back."

*CORRECTIONS: An earlier version of this story misstated Hilary Simon's age when she first had sex with Matt Rutledge. She was 18, not 17. This story erroneously reported that Trudy Hall is deceased.*

*This story has been updated.*

# More Great Stories From *Vanity Fair*

- Inside Prince Harry and Meghan Markle's Big Business Ambitions, 5 Years After Their Royal Exit

- In Memoriam: David Lynch Saw the Nightmare Beneath the American Dream

- See Our Predictions for This Year's Oscar Nominations

- How Donald Trump's Obsession With "Y.M.C.A." Broke Down the Village People

- Why Renée Zellweger "Needed to" Stop Acting for 6 Years

- Burning at Both Ends: Surviving a Week in Wildfire-Torn Los Angeles

- MAGA-verse's Clash of Titans: Bannon vs. Musk

Tab 3

**UTICA NATIONAL INSURANCE GROUP**                                      PAGE      1

REPUBLIC FRANKLIN INSURANCE CO.                 78224
180 GENESEE STREET                              BARDWELL, BOWLBY & KARAM
NEW HARTFORD, NY  13413                         87 EAST STREET
                                                P.O. BOX 1700
                                                PITTSFIELD, MA 01202
                                                (413) 445-5626

POLICY NUMBER:  CPP 3964893

NAMED INSURED:  MISS HALL'S SCHOOL INC

    ADDRESS:  492 HOLMES ROAD
              PITTSFIELD, MA 01201

FORM OF BUSINESS:  ORGANIZATION OTHER THAN PARTNERSHIP OR JOINT VENTURE

BUSINESS DESCRIPTION:  PRIVATE SCHOOL

POLICY PERIOD: FROM    07-01-07    TO    07-01-08    12:01 A.M. Standard Time at your address shown above.

In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

## COMMERCIAL GENERAL LIABILITY COVERAGE PART — DECLARATIONS

**LIMITS OF INSURANCE**

| | |
|---|---:|
| General Aggregate Limit (Other Than Products-Completed Operations) | $  3,000,000 |
| Products-Completed Operations Aggregate Limit | $  3,000,000 |
| Personal and Advertising Injury Limit | $  1,000,000 |
| Each Occurrence Limit | $  1,000,000 |
| Fire Damage Limit (Any One Fire) | $  1,000,000 |
| Medical Expense Limit (Any One Person) | $      10,000 |

LOCATIONS OF ALL PREMISES OTHER THAN THE ADDRESS SHOWN ABOVE WHICH YOU OWN, RENT OR OCCUPY
ARE LISTED ON COMMERCIAL GENERAL LIABILITY  DECLARATIONS—CONTINUED

**FORMS AND ENDORSEMENTS** APPLYING          **ADVANCE PREMIUM**    $      9,232.00
TO THIS COVERAGE PART:
  SEE 8-S-1018                                                      $      9,232.00

                                          **TOTAL ADVANCE PREMIUM**

_____
                                                      John A. Griffin
                                                  Authorized Representative

REPRINT        CPP CG  04 2 3964893
THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS,
COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

8-D-CG Ed. 01-92    Includes copyrighted material of Insurance Services Office, Inc., with its permission. Copyright Insurance Services Office, Inc., 1982, 1984

UNIBILL NO. 100751747                         INSURED         09-11-07   YOUR BILL WILL FOLLOW

POLICY NUMBER:   CPP 3964893

COMMERCIAL AUTO LIABILITY
COMMERCIAL GENERAL LIABILITY
COMMERCIAL INLAND MARINE
COMMERCIAL PROPERTY
CRIME

# SUPPLEMENTAL DECLARATIONS

Named Insured:  MISS HALL'S SCHOOL INC

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

| FORM | EDITION | TITLE |
| ---- | ------- | ----- |
| CG2267 | 10/93 | CORPORAL PUNISHMENT |
| 8C1213 | 07/97 | SCHOOL DISTRICT AND EDUCATORS LEGAL LIABILITY COVERAGE FORM |
| 8D1213 | 07/01 | SCHOOL DISTRICT AND EDUCATORS LEGAL LIABILITY INSURANCE DECL |
| 8E3204 | 01/04 | EMPLOYMENT - RELATED PRACTICES |
| 8C1848 | 11/01 | ABUSE OR MOLESTATION LIABILITY COVERAGE FORM |
| 8D1848 | 09/99 | ABUSE OR MOLESTATION LIABILITY COVERAGE PART(INCLUDING SEXUA |
| 8E1868 | 06/92 | EXCLUSION - ALL HAZARDS IN CONNECTION WITH DESIGNATED OPERAT |
| 8E1687 | 01/04 | EDUCATIONAL INST. COV.(EXCLUDING STUDENT MEDICAL EXPENSES) |
| CG2151 | 09/89 | AMENDMENT OF LIQUOR LIABILITY EXCLUSION-EXCEPTION FOR SCHEDU |
| 8C1014 | 09/04 | EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE FORM |
| 8D1014 | 09/04 | EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE PART DEC |
| 8E3499 | 01/04 | LIMITED COVERAGE FOR POLLUTANTS WITHIN BUILDINGS |
| 8E1657MA | 01/06 | SDELL-ADDITIONAL DEFENSE COVERAGE ENDORSEMENT |
| 8E2370 | 09/96 | ABUSE OR MOLESTATION EXCLUSION |
| 8E3345 | 12/01 | FUNGI OR BACTERIA EXCLUSION |
| CG2147 | 10/93 | EMPLOYMENT RELATED PRACTICES EXCLUSION |
| 8E3366 | 01/02 | ASBESTOS EXCLUSION |
| 8E3553 | 01/06 | LIMITED SPOUSAL COVERAGE |
| 8E3494MA | 01/07 | EDUCATIONAL INSTITUTION PACKAGE CHANGES |
| 8E3200 | 11/00 | ADDITIONAL INSURED - DESIGNATED PERSON OR ORGANIZATION |
| 8E3498MA | 01/04 | MASSACHUSETTS ABUSE OR MOLESTATION EXCLLUSION |
| CG0067 | 03/05 | EXCLUSION- VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX,PH |
| IL0985 | 01/06 | DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT |
| 8E3513 | 07/04 | AMENDMENT OF INSURED CONTRACT DEFINITION |
| 8E3502 | 01/04 | EXCLUSION- SILICA LIABILITY HAZARD |
| IL0021 | 04/98 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| CG0062 | 12/02 | WAR LIABILITY EXCLUSION |
| 8E3390 | 07/02 | GENERAL LIABILITY REVISION ENDORSEMENT |
| 8E3124 | 11/99 | POLLUTION EXCLUSION - PERSONAL AND ADVERTISING INJURY LIABIL |
| CG0054 | 03/97 | AMENDMENT OF POLLUTION EXCLUSION-EXCEPTION FOR BUILDING HEAT |
| CG0055 | 03/97 | AMENDMENT OF OTHER INSURANCE CONDITION (OCCURRENCE VERSION) |
| IL0017 | 11/98 | COMMON POLICY CONDITIONS |
| CG0001 | 10/93 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| 8E2119 | 07/96 | DIVIDEND PLAN ENDORSEMENT |
| CG2283 | 11/94 | MASSACHUSETTS CHANGES - LEAD POISONING ENDORSEMENT |

INSURED

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION **II**).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION **V**).

## SECTION I - COVERAGES

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement.**

  **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

    **(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION **III**); and

    **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES **A** AND **B**.

  **b.** This insurance applies to "bodily injury" and "property damage" only if:

    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

    **(2)** The "bodily injury" or "property damage" occurs during the policy period.

  **c.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

**2. Exclusions.**

  This insurance does not apply to:

  **a. Expected or Intended Injury**

  "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

  **b. Contractual Liability**

  "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    **(1)** Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

    **(2)** That the insured would have in the absence of the contract or agreement.

  **c. Liquor Liability**

  "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    **(1)** Causing or contributing to the intoxication of any person;

    **(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    **(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

  This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

Copyright, Insurance Services Office, Inc., 1992

**d. Workers Compensation and Similar Laws**

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

   **(a)** Employment by the insured; or

   **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

   **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

   **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

   **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

   **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

    **(i)** if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

    **(ii)** if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs **(a)** and **(d)(i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

   **(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

   **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

     Copyright, Insurance Services Office, Inc., 1992     CG  00 01 10 93     □

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

   **(a)** Less than 26 feet long; and

   **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage to Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product;"

**(2)** "Your work;" or

**(3)** "Impaired property;"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section **III**).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement.**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION **III**); and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES **A** AND **B**.

**b.** This insurance applies to:

**(1)** "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

**(2)** "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

**2.** Exclusions.

This insurance does not apply to:

**a.** "Personal injury" or "advertising injury:"

**(1)** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(2)** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

**(3)** Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

**(4)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**b.** "Advertising injury" arising out of:

**(1)** Breach of contract, other than misappropriation of advertising ideas under an implied contract;

Copyright, Insurance Services Office, Inc., 1992

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

1. Insuring Agreement.

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (1) The accident takes place in the "coverage territory" and during the policy period;

      (2) The expenses are incurred and reported to us within one year of the date of the accident; and

      (3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

      (1) First aid administered at the time of an accident;

      (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

      (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions.

   We will not pay expenses for "bodily injury:"

   a. To any insured.

   b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. To a person injured on that part of premises you own or rent that the person normally occupies.

   d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

   e. To a person injured while taking part in athletics.

   f. Included within the "products-completed operations hazard."

   g. Excluded under Coverage A.

   h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

We will pay, with respect to any claim or "suit" we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

Copyright, Insurance Services Office, Inc., 1992

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work.

5. All costs taxed against the insured in the "suit."

6. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Your "employees," other than your "executive officers," but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, no "employee" is an insured for:

      (1) "Bodily injury" or "personal injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), or to a co-"employee" while in the course of his or her employment or while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care sevices.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by;

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

         you, any of your "employees" or, if you are a partnership or joint venture, by any partner or member.

   b. Any person (other than your "employee"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

          Copyright, Insurance Services Services Office, Inc., 1992          CG 00 01 10 93

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.** Insureds;

    **b.** Claims made or "suits" brought; or

    **c.** Persons or organizations making claims or bringing "suits."

**2.** The General Aggregate Limit is the most we will pay for the sum of:

    **a.** Medical expenses under Coverage **C;**

    **b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard;" and

    **c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

**4.** Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    **a.** Damages under Coverage **A;** and

    **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence."

**6.** Subject to **5.** above, the Fire Damage Limit is the most we will pay under Coverage **A** for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

**7.** Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy.**

    Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit.**

    **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        **(1)** How, when and where the "occurrence" or offense took place;

        **(2)** The names and addresses of any injured persons and witnesses; and

        **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.** If a claim is made or "suit" is brought against any insured, you must:

        **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

        **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

  **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

  **(2)** Authorize us to obtain records and other information;

  **(3)** Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

  **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us.**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a.** Primary Insurance

This insurance is primary except when **b.** below applies. If this insurance is primary, our

obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b.** Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

  **(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

  **(2)** That is Fire insurance for premises rented to you; or

  **(3)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Coverage **A** (Section I).

When this insurance is excess, we will have no duty under Coverage **A** or **B** to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

  **(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

  **(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.** Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

Copyright, Insurance Services Office Inc., 1992

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit.**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew.**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

**1.** "Advertising injury" means injury arising out of one or more of the following offenses:

**a.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Oral or written publication of material that violates a person's right of privacy;

**c.** Misappropriation of advertising ideas or style of doing business; or

**d.** Infringement of copyright, title or slogan.

**2.** "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

**c.** All parts of the world if:

**(1)** The injury or damage arises out of:

**(a)** Goods or products made or sold by you in the territory described in **a.** above; or

**(b)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

**(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work;" or

**b.** Your fulfilling the terms of the contract or agreement.

**8.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection or engineering services.

**9.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

**10.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto;"

**b.** While it is in or on an aircraft, watercraft or "auto;" or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

**11.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

Copyright, Insurance Services Office, Inc., 1992

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **(1)** Power cranes, shovels, loaders, diggers or drills; or

   **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   **(1)** Equipment designed primarily for:

     **(a)** Snow removal;

     **(b)** Road maintenance, but not construction or resurfacing; or

     **(c)** Street cleaning;

   **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**12.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**13.** "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral or written publication of material that violates a person's right of privacy.

**14.a.** "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   **(1)** Products that are still in your physical possession; or

   **(2)** Work that has not yet been completed or abandoned.

**b.** "Your work" will be deemed completed at the earliest of the following times:

   **(1)** When all of the work called for in your contract has been completed.

   **(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

   **(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**c.** This hazard does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

**15.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**17.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(1)** You;

**(2)** Others trading under your name; or

**(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**18.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**19.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

**b.** The providing of or failure to provide warnings or instructions.

Copyright, Insurance Services Office, Inc., 1992

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL LIABILITY REVISION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following changes supersede any other provision to the contrary. In the event that your policy includes other provisions which modify the Commercial General Liability Coverage Form, those other provisions will apply, but only to the extent that they do not conflict with these changes.

I. Under **Section I - Coverages**, the **Insuring Agreement** of **Coverage A** is replaced by the following:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Utica Mutual Insurance Company, 2002.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

  **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

  **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

  **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**II.** The following changes apply to Paragraph **2., Exclusions** of **Coverage A:**

  **A.** The following is added to **Aircraft, Auto Or Watercraft:**

  This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

  **B.** Part **(1)** under **Damage To Property** is replaced by the following:

  **(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**III.** The following changes apply to Paragraph **2., Exclusions** of **Coverage B - Personal And Advertising Injury Liability:**

  **A.** The exclusion for "advertising injury" arising out of an offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting is replaced by the following:

  **Insureds In Media And Internet Type Businesses**

  "Personal injury" or "advertising injury" committed by an insured whose business is:

  **(1)** Advertising, broadcasting, publishing or telecasting;

  **(2)** Designing or determining content of web-sites for others; or

  **(3)** An Internet search, access, content or service provider.

  However, this exclusion does not apply to paragraphs **a., b.** and **c.** under the definition of "personal injury".

  For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

  **B.** If your policy contains an exclusion for liability arising out of:

  **(a)** The willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

  **(b)** A criminal act committed by or at the direction of any insured;

  that exclusion is replaced by the following:

  Arising out of a criminal act committed by or at the direction of the insured;

  **C.** The following exclusions are added:

  **1. Electronic Chatrooms Or Bulletin Boards**

  "Personal injury" or "advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**2. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal injury" or "advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**3. Unauthorized Use Of Another's Name Or Product**

"Personal injury" or "advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**IV.** Under **Section II - Who Is An Insured,** the following is added to Paragraph **1. :**

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**V.** The following changes apply to **Section V - Definitions:**

**A.** The following definition is added:

"Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**B.** "Advertising injury" is replaced by the following:

"Advertising injury" means injury arising out of one or more of the following offenses:

**a.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**c.** Misappropriation of advertising ideas or style of doing business; or

**d.** Infringement of copyright, title or slogan.

**C.** "Coverage Territory" is replaced by the following:

"Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in **a.** above;

**(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

**(3)** "Personal injury" or "advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

**D.** "Personal injury" is replaced by the following:

"Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**E.** "Property damage" is replaced by the following:

"Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

8-E-3390   Ed. 7-2002

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ABUSE OR MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.,** **Exclusions** of **Coverage A - Bodily Injury And Property Damage Liability (Section I - Coverages)** and Paragraph **2., Exclusions** of **Coverage B - Personal And Advertising injury Liability (Section I - Coverages):**

This insurance does not apply to "bodily injury," "property damage," "advertising injury" or "personal injury" arising out of:

**1.** The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

**2.** The negligent:

    **a.** Employment;

    **b.** Investigation;

    **c.** Supervision;

    **d.** Reporting to the proper authorities, or failure to so report; or

    **e.** Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **1.** above.

For the purposes of this endorsement, abuse means an intentional, inherently harmful act.

**UTICA NATIONAL INSURANCE GROUP**

Issuing Company: _____

A MEMBER OF UTICA NATIONAL INSURANCE GROUP

# ABUSE OR MOLESTATION LIABILITY COVERAGE PART
## (INCLUDING SEXUAL MISCONDUCT OR SEXUAL MOLESTATION)

(For Attachment to a Liability or Package Policy)

The following spaces preceded by an asterisk (*) need not be completed if this Coverage Form and the Policy have the same inception date.

| ATTACHED TO AND FORMING PART OF POLICY NO. | *EFFECTIVE DATE OF COVERAGE FORM | *ISSUED TO |
|---|---|---|
|  |  |  |

## ADDITIONAL DECLARATIONS

IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| SCHEDULE | | |
|---|---|---|
| **COVERAGE** | **LIMITS OF LIABILITY** | |
| Legal Liability | $ _____0 | Each Loss |
|  | $ _____0 | Annual Aggregate |

**ADVANCE PREMIUM**

Total Advance Premium $

Premium shown is payable** $           at inception; $           1st Anniversary; $           2nd Anniversary

**FORMS AND ENDORSEMENTS**

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:

**

Countersigned:**

Date:                                          By _____

Company Officer

**Entry optional if shown in Common Policy Declarations.

+ Forms and Endorsements applicable to this Coverage Part omitted if shown elsewhere in the policy.

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

# ABUSE OR MOLESTATION LIABILITY COVERAGE FORM (INCLUDING SEXUAL MISCONDUCT OR SEXUAL MOLESTATION)

**Please read the entire form carefully.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us," and "our" refer to the Company providing the insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

## SECTION I - ABUSE OR MOLESTATION LIABILITY COVERAGE (INCLUDING SEXUAL MISCONDUCT OR SEXUAL MOLESTATION)

1. **Insuring Agreement.**

   a. We will pay on behalf of the insured those sums that the insured becomes legally obligated to pay for "loss" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking such payment even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking payment for "loss" to which this insurance does not apply. We may, at our discretion, investigate any incident and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of "loss."

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

   b. This insurance applies only to "loss" which results from a "wrongful act", and then only when such "wrongful act" first takes place during the "policy period." All "wrongful acts" which constitute one "loss" will be deemed to first take place at the time of the earliest of such "wrongful acts."

2. **Exclusions.**

   This insurance does not apply:

   a. To any person who:

      (1) Participated in or who conspired with or directed a participant in any "wrongful act"; or

      (2) Knowingly allowed any "wrongful act" or failed to report any "wrongful act" to proper authorities.

   b. To the cost of defense of, or payment of fines for, any person who actually or allegedly violated any penal or criminal statute.

   c. If you fail to give us written notice within 60 days of your being notified of an incident which appears likely to result in a claim or "suit" involving a "wrongful act."

   d. To liability assumed by the insured under any contract or agreement, but this exclusion does not apply to liability for "loss" that the insured would have in the absence of the contract or agreement.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright, Utica Mutual Insurance Company, 2001.

e.  To any obligation of the insured under a workers compensation, disability benefits, or unemployment compensation law, or any similar law.

f.  To injury to:

(1)  An employee of the insured arising out of and in the course of employment by the insured; or

(2)  The spouse, child, parent, brother, or sister of that employee as a consequence of (1) above.

This exclusion applies:

(1)  Whether the insured may be liable as an employer or in any other capacity; and

(2)  To any obligation to share damages with or repay someone else who must pay damages because of injury.

g.  To "loss" arising from the ownership, maintenance, operation, use, entrustment, loading or unloading of any watercraft, or aircraft.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "wrongful act" which caused the "loss" involved the ownership, maintenance, use or entrustment to others of any aircraft, or watercraft.

h.  To exemplary or punitive damages.

i.  To "loss" arising from any violation of the civil rights of any person.

j.  (1)  "Loss" to a person arising out of any:

(a)  Refusal to employ that person;

(b)  Termination of that person's employment; or

(c)  Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2)  "Loss" to the spouse, child, parent, brother or sister of that person as a consequence of injury to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1)  Whether the insured may be liable as an employer or in any other capacity; and

(2)  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

3.  **Supplementary Payments.**

We will pay, with respect to any claim we investigate or settle or any "suit" against an insured we defend:

a.  All expenses we incur.

b.  The cost of appeal bonds, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

c.  All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.

d.  All costs taxed against the insured in the "suit."

e.  Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

f.  All interest on the full amount of any judgment that accrues after the entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**SECTION II - WHO IS AN INSURED**

Each of the following is an insured under this coverage subject to all the exclusions and provisions thereof:

1.  You and any "affiliate."

2.  Your employees, directors, officers, trustees, clergy, wardens, deacons, elders, teachers, members of the vestry, members of the board of trustees, members of the board of governors, or members of the board of education while acting within the scope of their duties as such.

3.  With respect to the liability of insureds described above, the heirs, administrators, assigns, and legal representatives of each insured in the event of death, incapacity, or bankruptcy.

4.  Employees, directors, officers, trustees, clergy, wardens, deacons, elders, teachers, members of the vestry, members of the board of trustees, members of the board of governors, or members of the board of education of any "affiliate" acquired or formed after the effective date of this Coverage Part, while acting within the scope of their duties as such, but only if the first Named Insured shown in the Declarations:

a. Provides immediate written notice of such acquisition or formation to us;

b. Furnishes such additional information as we require as soon as practicable; and

c. Pays promptly such additional premium as is required.

However, coverage under this provision does not apply to any "wrongful act" that took place before you formed or acquired the "affiliate."

5. Any other member of yours but only while acting on your behalf.

6. Any volunteer worker but only while acting on your behalf with your consent and knowledge.

**SECTION III - LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits."

2. The Annual Aggregate Limit is the most we will pay for the total of all "losses" covered by this Coverage Part.

3. Subject to **2.** above, the Each Loss Limit is the most we will pay for damages because of each "loss" as defined.

4. The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - ABUSE OR MOLESTATION LIABILITY CONDITIONS (INCLUDING SEXUAL MISCONDUCT OR SEXUAL MOLESTATION)**

1. **Bankruptcy.**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties in the Event of "Wrongful Act," Claim, or "Suit."**

   **(See Exclusion c. Also.)**

   a. You must see to it that we are notified as soon as practicable (and within 60 days of any notice to you) of any "wrongful act" which may result in a claim. To the extent possible, notice should include:

   (1) How, when, and where the "wrongful act" took place;

   (2) The names and addresses of any persons involved in the "wrongful act" and witnesses; and

   (3) The nature of the harm resulting from the "wrongful act."

   b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received; and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses, or legal papers received in connection with the claim or "suit;"

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit;" and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "loss" to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

3. **Legal Action Against Us.**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured, and the claimant or the claimant's legal representative.

4. **Other Insurance.**

If other valid and collectible insurance is available to the insured for a "loss" we cover under this Coverage Part, our obligations are limited as follows:

a. This insurance is primary with respect to insurance that is specifically written as excess over this insurance.

b. Excess Insurance

(1) This insurance is excess over any insurance that is not specifically described in item **a.** above, whether primary, excess, contingent, or on any other basis available to any insured under this Coverage Part.

(2) When this insurance is excess, we will have no duty to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the "loss," if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the "loss" in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining "loss," if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the "loss" remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Two or More Coverage Forms**

Except for the insurance provided by this Coverage Part, the policy to which this Coverage Part is attached does not apply to any claim or "suit" seeking damages arising out of any actual or alleged act of abuse or molestation (including sexual misconduct or sexual molestation).

6. **Representations.**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer of Rights of Recovery Against Others to Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after "loss" to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew.**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

10. **State Changes.**

Any state amendatory endorsement changing Cancellation or Nonrenewal Conditions for any part of this policy shall also apply to this Coverage Part.

**SECTION V - DEFINITIONS**

1. "Affiliate" means any entity wholly owned by you or owned through one or more of your "affiliates." Coverage shall apply to "affiliates" which existed prior to or at the inception date of this Coverage Part. In the event of sale or dissolution of any

"affiliate" after the inception date of this Coverage Part, coverage shall continue to apply to all persons who were persons insured of the "affiliate" with respect to claims for "wrongful acts" prior to the time of sale or dissolution. However, in the event of sale, coverage shall cease as of the date of sale for subsequent persons in such positions.

2. **a.** "Loss" means any damages which the insured is legally obligated to pay for any claim to which this insurance applies and shall include judgments and settlements and also includes damages claimed by any person or organization for care, loss of services, or death resulting at any time from a "wrongful act." "Loss" shall not include fines or penalties imposed by law or other matters which may be deemed uninsurable under the law pursuant to which the policy shall be construed.

   **b.** All:

   **(1)** Covered acts of abuse or molestation (including sexual misconduct or sexual molestation) by one person, or by two or more persons acting together; and

   **(2)** Breaches of duty related to the acts in item **(1)** immediately above;

   will constitute one "loss" and be subject to the Each Loss Limit of Insurance.

3. "Policy period" means that period stated in the Declarations of the policy. But if this Coverage Part is issued subsequent to the issuance of the policy, the "policy period" hereunder will commence only as of the effective date of this Coverage Part and shall terminate with the policy termination.

4. "Suit" means a civil proceeding in which damages because of "loss" from "wrongful acts" to which this insurance applies are alleged. "Suit" includes:

   **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

5. "Wrongful act" means:

   **a.** Any act of actual or threatened abuse or molestation (including sexual misconduct or sexual molestation) which results in injury to another; or

   **b.** The negligent:

   **(1)** Employment;

   **(2)** Investigation;

   **(3)** Supervision;

   **(4)** Reporting to the proper authorities, or failure to so report; or

   **(5)** Retention;

   of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **a.** above.

   For the purpose of this coverage, abuse means an intentional, inherently harmful act.